Filed 8/29/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| VICTOR MICHAEL ARRIAGA,<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>Respondent;<br><br>THE PEOPLE,<br><br>Real Party in Interest. | B340795<br><br>(Los Angeles County<br>Super. Ct. No. BA316520) |

ORIGINAL PROCEEDINGS in prohibition. Shelly B. Torrealba, Judge. Petition granted.

Ricardo D. Garcia, Public Defender, Chelsea Padilla and Albert J. Menaster, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Nathan J. Hochman, District Attorney, Cassandra Thorp and Byron Beck, Deputy District Attorneys, for Real Party in Interest.

––––––––––––––––––––––

Petitioner Victor Arriaga petitions for a peremptory writ of prohibition directing the trial court to grant his motion to dismiss the information for violation of his state speedy trial right and his federal right to due process. Arriaga contends that the 16-year delay between the People's filing of a felony complaint alleging one count of wrongful diversion of construction funds in 2007, and his arraignment on the count in 2023, resulted in prejudice to him that outweighed any justification for the delay. We agree and grant Arriaga's petition.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

In August 2006, Gilbert Torres entered into an oral agreement with Arriaga for the repair or replacement of drywall in his bathroom ceiling that had been damaged by a water leak from the balcony above it. In September 2006, Arriaga and his father visited Torres's home to evaluate the damage. Arriaga

---

[1] Arriaga submitted several exhibits in support of his petition: the original and amended felony informations filed in 2023; the minute orders documenting his pretrial proceedings in 2023 and 2024; the preliminary hearing transcript; his motion to dismiss and the accompanying exhibits; the People's opposition to his motion; and the court's written ruling denying the motion.

We take the underlying facts from the victim's testimony at the preliminary hearing and the Statement of Complainant/Owner in the Contractors State License Board (CSLB) investigative report attached as an exhibit to Arriaga's motion to dismiss.

estimated the job would cost $400 and would take a day or two. Torres paid Arriaga $200 for project costs.

Throughout the first week of work, Arriaga called Torres and informed him about other damage to the bathroom walls and ceiling that required repair before he could fix the drywall. Torres approved the additional repairs and paid Arriaga $1,200 by check to purchase materials. Torres testified that he also paid Arriaga between $4,000 and $6,000 in cash for the additional repairs.

Arriaga's father worked with him on the repairs to Torres's home. According to Torres, Arriaga said he and his father "were both extremely knowledgeable in construction, private construction . . . . And . . . their forte was . . . framing and building." In mid-September 2006, Arriaga and his father told Torres that he should build a room where the balcony was to prevent future leaks. Torres agreed to the additional work but wanted it reflected in a written contract, which Arriaga agreed to draft.

The record does not contain a copy of the contract, but Torres attested to its terms in a declaration attached to the CSLB report. According to Torres, "[t]he contract stated that all bathroom walls (the wood and drywall) would be repaired; the ceiling would be repaired; the walls in an adjoining laundry room would be replaced; and a room addition would be constructed above the bathroom in [his] daughter's bedroom." Torres testified that the contract covered both the initial repair and the additional repairs Arriaga identified. It did not contain any further details about the tasks to be completed, the costs of labor, or the equipment needed. According to Torres, Arriaga told him the total cost of the project would be $16,000. Both Torres and

3

Arriaga signed the agreement.  Shortly after, Arriaga told Torres that he had found more water damage in the walls and would need to revise the contract to account for the cost of additional repairs.  Arriaga took the contract back from Torres for revisions, but he never returned it.

Torres testified that Arriaga and his father then began working only sporadically during the week, and for only two to three hours each day.  Torres continued paying Arriaga for the work.  Between September and October 2006, Torres wrote four checks totaling $12,000 for the costs of the project, including compensation to Arriaga's father and another person who worked for Arriaga on the project.  Torres also purchased windows for the new addition because Arriaga told him he was losing money on the project.

Almost two months after starting the work, Arriaga had not completed the initial repairs to the drywall, any additional repairs of damage he had previously identified, or the construction of the additional room.  In late October 2006, Torres told Arriaga that if the work was not completed by the end of the month, he would "seek out legal remedies to ensure that it was finished."  In response, Arriaga returned to Torres's property on a later date and told Torres he would no longer work for him.  Arriaga and his father loaded their van with "all of their equipment" and "all their tools and materials" and left without completing the work.[2]  Torres tried unsuccessfully to contact Arriaga after he left.

---

[2]     It is unclear how much work Arriaga finished, and how much remained incomplete, at the time Arriaga and his father left.  At the preliminary hearing, Torres testified Arriaga only

In November 2006, the Los Angeles Building and Safety Department issued a stop-work notice to Torres because he did not have permits for the construction and the work Arriaga had performed was not code compliant.  Later in November, the CSLB opened an investigation and discovered Arriaga was not a licensed contractor in California.  An investigator sent a certified letter to Arriaga informing him that a CSLB complaint had been filed against him and asking him to call the investigator.  Arriaga signed a return receipt for the letter in November 2006.  In November and December 2006, the investigator's calls to Arriaga went unanswered and the investigator was unable to leave a message.  The CSLB referred the case to the district attorney.

On February 2, 2007, the district attorney filed a felony complaint and an arrest warrant issued.  However, the People concede there is no evidence that law enforcement ever attempted to contact Arriaga or inform him about the warrant.

It appears that at some point—the record does not reveal when—Arriaga relocated to Nevada.  According to the People, Arriaga applied for a driver's license in Nevada in 2011.  In 2022, Arriaga learned about the outstanding warrant when he was arrested for a misdemeanor in Nevada.  In June 2023, he returned to Los Angeles to clear the warrant.[3]  Arriaga appeared

---

completed the framing of the additional room.  The CSLB investigative report, however, indicates that Torres said Arriaga had finished "framing the addition; installing insulation and drywall in the addition; and installing new rafters and studs in the existing bathroom and kitchen."

[3]  Arriaga's motion to dismiss states that he called the Los Angeles Superior Court in June 2022 and was informed that the

in the Los Angeles Superior Court, the warrant was recalled, and he was arraigned. The People then filed an information alleging one felony count of wrongful diversion of construction funds (Pen. Code, § 484b; count 1).[4] The People later amended the information to add circumstances in aggravation and a misdemeanor count for contracting without a license (Bus. & Prof. Code, § 7028, subd. (a)). In July 2023, the court held a preliminary hearing. Only Torres testified. Arriaga was held to answer.

In March 2024, Arriaga moved to dismiss the information on the ground that the People's delay in prosecuting him after the filing of the felony complaint violated his state and federal rights to a speedy trial. Arriaga argued that the delay caused him to suffer actual prejudice because evidence key to his defense was no longer available and other witness memories had faded. Specifically, Arriaga contended Wells Fargo had purged his bank records pursuant to its record retention policy, preventing him from showing that he lawfully used the funds Torres paid him for the construction project.

Arriaga also contended that his father's death in 2011 meant his father could not testify to the cost of the repairs or to Arriaga's lawful use of the funds to pay wages for his labor on the project. Arriaga asserted that his father "was directly involved in

_____

warrant was not in the system. The motion also states that in June 2023, after Arriaga's probation officer in Nevada told him the warrant was still appearing on his record, he received permission to travel to Los Angeles "to seek clarification from the court." These assertions are not supported by any evidence.

[4] All further undesignated statutory references are to the Penal Code.

6

the initial evaluation of the damage, was present during various conversations between Mr. Arriaga and Mr. Torres, and more importantly worked on the house and saw the full extent of the damage that needed to be repaired."

The People opposed the motion. They argued Arriaga had not demonstrated actual prejudice because he did not establish that witness memories had faded, and his offers of proof about the bank records and his father's testimony failed to describe evidence that would support a defense to the section 484b charge since it would not show he completed the project. The People also contended that Arriaga caused the delay by contracting without a license and failing to respond to the CSLB investigator.

The trial court denied the motion. With respect to Arriaga's state speedy trial right, the court found Arriaga failed to demonstrate actual prejudice because the lost evidence could not "plausibly exculpate" Arriaga from liability under section 484b since it was undisputed that he failed to complete the work at Torres's house. The court also concluded the People proffered a legitimate justification for the delay in that Arriaga ignored state licensing requirements, did not respond to the CSLB's communications, and left California during the delay period.

Arriaga filed a petition for writ of prohibition in this court. Although we summarily denied the petition, the Supreme Court granted Arriaga's petition for review and transferred the matter back to this court. At our high court's direction, we vacated the denial and issued an order to show cause.

## DISCUSSION

Arriaga contends the People's delay in prosecuting the felony charge under section 484b violated his federal right to due

process and his speedy trial right under the California constitution.[5] We conclude that the People's 16-year delay between filing the felony complaint in 2007 and Arriaga's arraignment in 2023 violated his state speedy trial right.

## I.  Applicable Legal Principles

The California Constitution guarantees criminal defendants the right to a speedy trial.  (Cal. Const., art. I, § 15, cl. 1.)  "Under the *state* Constitution, the filing of a felony complaint is sufficient to trigger the protection of the speedy trial

---

[5]     Arriaga does not pursue his federal speedy trial claim in this writ proceeding.  Further, although Arriaga's motion asked the trial court to "dismiss the charges filed," the motion raised arguments specific only to the felony count charged under section 484b.  Similarly, although the People and the trial court acknowledged that Arriaga had also been charged with a misdemeanor violation of Business and Professions Code section 7028, subdivision (a), neither the People's arguments, nor the trial court's analysis, referenced the misdemeanor.  Instead, the parties and the court appeared to exclusively consider the section 484b felony charge.  We therefore do not construe Arriaga's motion as seeking dismissal of the misdemeanor count for contracting without a license.  Moreover, as the parties confirmed at oral argument, neither Arriaga's writ petition nor the People's return included an analysis of the federal or state speedy trial factors as applied to the misdemeanor count. Because neither party addressed the misdemeanor count below or in their briefing in this writ proceeding, we do not address it. Our ruling is without prejudice to any remedies or arguments the parties may have on remand regarding the misdemeanor count under Business and Professions Code section 7028, subdivision (a).  Finally, because we conclude Arriaga's right to a speedy trial under state law was violated, we do not reach the merits of his federal due process arguments.

right." (*People v. Martinez* (2000) 22 Cal.4th 750, 754.) In California, only a delay occurring "after the complaint is filed and before arrest" (the post-complaint delay) implicates a defendant's speedy trial right. (*People v. Hayton* (1979) 95 Cal.App.3d 413, 418 (*Hayton*); *Scherling v. Superior Court* (1978) 22 Cal.3d 493, 504 (*Scherling*).)

"The essence of a defendant's speedy trial . . . claim in the usual case is that the passage of time has frustrated his ability to establish his innocence." (*Hayton*, *supra*, 95 Cal.App.3d at p. 419, fn. omitted.) Courts balance the prejudice to a defendant resulting from the delay against the prosecution's justification for the delay. (*Scherling*, *supra*, 22 Cal.3d at p. 505.) "[T]he defendant has the initial burden of showing some prejudice before the prosecution is required to offer any reason for the delay." (*Garcia v. Superior Court* (1984) 163 Cal.App.3d 148, 151 (*Garcia*).) If the defendant makes the necessary prima facie showing of prejudice, the burden shifts to the prosecution to explain the delay. (*Ibid.*) The court then balances the showing of prejudice against any asserted justification for the delay to determine if the delay violated the defendant's right to a speedy trial. (*Id.* at pp. 151–152.)

"We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation] and defer to any underlying factual findings if substantial evidence supports them [citation]." (*People v. Cowan* (2010) 50 Cal.4th 401, 431.) Legal conclusions are reviewed de novo. (*People v. Buchanan* (2022) 85 Cal.App.5th 186, 191.) "Whether a delay is prejudicial is a factual question that we review for substantial evidence." (*People v. Manzo* (2023) 96 Cal.App.5th 538, 542 (*Manzo*).)

9

## II. The Trial Court Abused its Discretion in Denying Arriaga's Motion To Dismiss Based on His State Speedy Trial Right

### A. Substantial evidence did not support the conclusion that Arriaga failed to make a prima facie showing of prejudice

In the speedy trial analysis, a defendant has the initial burden to make a prima facie showing that a delay in prosecution caused actual prejudice. (*Craft v. Superior Court* (2006) 140 Cal.App.4th 1533, 1540.) A defendant may meet this burden by demonstrating "that the loss of such evidence . . . makes it difficult or impossible for the defendant to prepare a defense . . . ." (*People v. Mirenda* (2009) 174 Cal.App.4th 1313, 1328 (*Mirenda*).)

"The showing of actual prejudice must be made on competent evidence and 'must be supported by particular facts and not . . . by bare conclusionary statements.' [Citation.] Speculative arguments are inadequate to establish actual prejudice. [Citations.] Instead, the defendant must affirmatively demonstrate having suffered actual prejudice as a result of the delay, not just the possibility of prejudice." (*Manzo*, *supra*, 96 Cal.App.5th at pp. 541–542; see, e.g., *Garcia*, *supra*, 163 Cal.App.3d at pp. 150–151 [petitioner met burden by submitting declaration that after year-long delay, she could not find witnesses who saw illegal police search and proof of innocence]; *Kaikas v. Superior Court* (1971) 18 Cal.App.3d 86, 90–91 [defendant's vague assertions that he could not locate key witnesses due to delay did not satisfy prima facie burden].)

For example, in *Fowler v. Superior Court* (1984) 162 Cal.App.3d 215 (*Fowler*), the defendant moved to dismiss the

10

information for a violation of his speedy trial right after key evidence supporting his defense—a recording of the anonymous call reporting his alleged crime—was erased before he was held to answer. The defendant argued the loss of the recording prevented him from proving the call was placed by a police officer as an act of retaliation. (*Id*. at p. 218.) In a writ proceeding challenging the trial court's denial of the defendant's motion, the appellate court concluded the defendant made a sufficient showing of prejudice "by proving the loss of the dispatcher's tape coupled with a plausible explanation of what he might have been able to prove if the tape were available." (*Id*. at p. 220.) The court rejected the trial court's view that the defendant had to "establish the tape would reveal a . . . phone call from a Los Angeles policeman . . . ." (*Ibid*.) It explained that "[t]he [trial] court's reasoning is circular: The motion was denied because the defendant could only 'speculate' that evidence lost during an unexplained delay in the proceedings would have assisted him, when, of course, that was the very basis for the motion in the first place." (*Ibid*.) The possibility that the tape would have helped prove a specific defense was sufficient to require the trial court to weigh the prejudice to the defendant against justification for the delay. (*Ibid*.)

In this case, Arriaga contends that the prosecution's post-complaint delay prejudiced him because his bank purged his account records from 2006, and his father died in 2011. He contends the lost evidence would have created reasonable doubt about whether he received all funds from Torres necessary to complete the repairs and renovations Torres asked him to perform, and whether he used the funds for purposes other than those related to the work he completed. The People argued

11

Arriaga could not demonstrate prejudice because the lost evidence would not undermine the prosecution's case, based on the elements and nature of the crime. The trial court accepted these arguments. We therefore first consider section 484b.

### 1. Section 484b

"The purpose[ ] of section 484b is to punish fraudulent conversion. [Citation.] But so long as construction funds are used on bona fide costs of the project for which they are received there is no conversion. [¶] . . . The interest section 484b seeks to protect is the economic security provided by a direct transmutation of construction funds into project assets. Where a progress payment is applied to bona fide project costs the owner and lender receive a value in project assets presumably of equivalent value to the construction funds that have been so used." (*People v. Butcher* (1986) 185 Cal.App.3d 929, 938 (*Butcher*).)

Section 484b thus prohibits a person who receives money for a construction project from "wrongfully divert[ing]" (*ibid*.) those funds from the "bona fide costs of the project." (*Butcher, supra,* 185 Cal.App.3d at p. 938.)[6] "Wrongfully diverting funds

---

[6] Section 484b provides: "Any person who receives money for the purpose of obtaining or paying for services, labor, materials or equipment and willfully fails to apply such money for such purpose by either willfully failing to complete the improvements for which funds were provided or willfully failing to pay for services, labor, materials or equipment provided incident to such construction, and wrongfully diverts the funds to a use other than that for which the funds were received, shall be guilty of a public offense . . . ." The statute was amended in 2010 to increase the threshold for a felony violation from $1,000 to $2,350; the text of

simply means 'not applying the funds for the purpose for which they were disbursed.' [Citation.]" (*People v. Williams* (2013) 218 Cal.App.4th 1038, 1064 (*Williams*).)

A contractor is criminally liable under section 484b when the contractor's diversion of funds causes "the contractor's failure to complete the agreed-upon work or failure to pay for the associated labor, materials, or equipment." (*Williams, supra*, 218 Cal.App.4th at p. 1064; *People v. Stark* (1994) 26 Cal.App.4th 1179, 1183–1184 (*Stark*) [violation of § 484b requires "wrongful diversion of the funds" and "that the diversion be the cause of at least one of the described failures"]; *Butcher, supra*, 185 Cal.App.3d at pp. 939–940, 941.) Section 484b is intended "to punish for a fraudulent conversion and not for failure to comply with a contractual obligation." (*People v. Howard* (1969) 70 Cal.2d 618, 623 (*Howard*).)

With these legal principles as context, we consider the trial court's finding that Arriaga failed to show actual prejudice from the loss of his bank records and his father's testimony.

### 2. Bank records

Substantial evidence supported the trial court's conclusion that Arriaga did not demonstrate prejudice based on the loss of his bank records. While Arriaga showed that the bank records are now unavailable, he failed to provide a plausible explanation of what those records would show relevant to his defense. (*Fowler, supra*, 162 Cal.App.3d at p. 220.)

Specifically, Arriaga did not explain what information his bank records contained that would establish he used the funds he received from Torres for bona fide project costs. For example,

---

the statute otherwise remained the same. (Stats. 2009, ch. 28, § 14.)

13

Arriaga does not contend that the statements would have shown his expenditures in September or October 2006, reflecting that he used Torres's funds to pay for materials, equipment, or labor necessary for the repairs or construction. Nor does he assert that the bank records show deposits and withdrawals which, in conjunction with receipts or other evidence of his expenditures, would permit the inference that he spent Torres's funds on bona fide project costs. His conclusory argument that the records would show he did not divert the funds does not satisfy his prima facie burden to show prejudice. (See *People v. Lewis* (2015) 234 Cal.App.4th 203, 212 [defendant's contention that lost records "might have contained information he could have used to impeach" victim inadequate to establish actual prejudice for due process violation]; see also *Manzo*, *supra*, 96 Cal.App.5th at p. 542 [" ' "[t]he showing of prejudice requires *some evidence* and cannot be presumed" ' "].)

### 3. Father's testimony

We reach the opposite conclusion as to the loss of Arriaga's father's testimony. Considering the requirements of section 484b, the evidence did not support the trial court's finding that Arriaga suffered no prejudice from his inability to call his father as a witness.

While Arriaga did not offer a declaration attesting to what his father's testimony would have been, the record otherwise provided evidence illustrating the information his father could reasonably have been expected to provide. It is undisputed that Arriaga's father worked with him on the repair and construction work at Torres's residence. Additionally, the People's evidence at the preliminary hearing established that Arriaga's father was present and even participated in conversations about the extent

14

of the damage to Torres's property and the additional work Torres agreed to have Arriaga and his father perform.

Arriaga has plausibly explained that his father's testimony would confirm Arriaga paid him for working on Torres's residence, which in turn would have supported a defense that Arriaga used at least some of Torres's funds to pay bona fide project costs. Arriaga's father's testimony would have been particularly material in light of Torres's conflicting testimony and statement regarding how much work Arriaga and his father completed on the project. It is plausible that Arriaga's father's testimony would have corroborated that the costs of the project legitimately kept increasing, supporting Arriaga's defense that he spent the funds he received from Torres on the project even though he did not complete it.

In the trial court, the People's primary argument was that Arriaga's failure to complete the job established the section 484b violation, even if he used Torres's funds to lawfully purchase necessary materials, pay labor costs, and meet increased project costs. As such, Arriaga's father's favorable testimony about the extent of the damage and lawful expenditure of funds would not have aided Arriaga's defense. This argument is inconsistent with section 484b.

*Howard*, *supra*, 70 Cal.2d 618, is instructive. In *Howard*, the defendant, a contractor, argued section 484b was unconstitutional because it offended the constitutional ban on imprisonment for debt. (*Howard*, at p. 621.) The California Supreme Court acknowledged that "the constitutional prohibition against imprisonment for debt applies in a criminal proceeding where legislation under which the accused is charged constitutes an attempt to make the mere act of failing to pay a debt a crime.

15

However, the constitutional prohibition is expressly subject to the exception 'unless in case of fraud.' " (*Id*. at p. 622.)

As a result, "under Penal Code section 484b it must be shown that there was a wilful failure to complete improvements or to pay labor and materialmen, that the funds received for that purpose were diverted with resultant harm to the homeowner or to the lender who provided the funds. It clearly appears that a contractor guilty of such conduct has also acted against good morals and fair dealing, that his conduct has necessarily prejudiced the rights of homeowners and of those who may have provided financing, and that his acts likewise constitute a 'case of fraud' within the exception to the constitutional ban on imprisonment for debt. In *Daugherty v. State* (1965) 216 Tenn. 666 . . . , the court in upholding a statute similar to section 484b declared that the legislative purpose of the statute was to punish for a fraudulent conversion and not for failure to comply with a contractual obligation. The same purpose would appear in the provisions of section 484b." (*Howard, supra*, 70 Cal.2d at p. 623.)

We therefore disagree that the prosecution may prove the People's case against Arriaga under section 484b merely by showing he failed to complete the work at Torres's property. The People are required to demonstrate that Torres *diverted* the funds Torres paid him for some other purpose. As such, Arriaga's father's testimony about the extent of the contracted repairs, Arriaga's use of the funds, and the amount of work completed, all would have served to bolster Arriaga's defense to the People's case and to create reasonable doubt as to whether Torres paid the full project costs and did not receive labor or materials equal to that amount.

The People also argue Arriaga's father's testimony would not have changed the fact that Arriaga's receipt of Torres's payments was "tantamount to a diversion" of funds, irrespective of how Arriaga used the money, because he was not a licensed contractor in California. Not so. As stated above, to violate section 484b, a defendant's use of funds must interfere with the property owner's right to receive repairs, renovations, or other construction work of equal value to the funds allotted for that work. (*Butcher*, *supra*, 185 Cal.App.3d at p. 938.) A defendant therefore completes the offense in section 484b only if the defendant's wrongful diversion of funds "was the cause of failure either to complete the improvement or . . . to pay for services, labor, materials or equipment." (*Stark*, *supra*, 26 Cal.App.4th at p. 1182.) Performing contracting work without a license alone does not cause either result. Neither the express language of section 484b, nor caselaw interpreting the statute, supports the People's argument that contracting without a license is a per se violation of section 484b. Nor do the People cite any legal authority to support this argument.

The People assert that Arriaga's father's testimony would not have negated the elements of section 484b because his father did not "bid the job," receive money from Torres, or "make promises to perform." But these facts have no bearing on the evidentiary value of his testimony to Arriaga's defense. It is undisputed that Arriaga's father was one of Arriaga's workers and that he was involved in assessing the damage at Torres's property and proposing repairs. He was a percipient witness who could testify to Arriaga's expenditures on the various construction projects undertaken in Torres's home, the value of work performed, and the cost of work yet to be completed. His

testimony would have been material to a defense that Arriaga used Torres's money for the costs of the work he completed before he walked off the job, even if Arriaga did not finish all projects he agreed to undertake.

The People also contend that the absence of Arriaga's father's testimony does not prejudice Arriaga's defense because his removal of materials from Torres's house demonstrates that he wrongfully diverted funds in violation of section 484b. We disagree. Arriaga's father's testimony could have raised reasonable doubt about whether the materials in question included items that subjected Arriaga to liability. Torres told the CSLB investigator that Arriaga and his father left with "all *their* tools and materials," and later testified that they took "*their* equipment." (Italics added.) It is not clear whether the items Arriaga and his father took were paid for with Torres's funds. It is undisputed, however, that Arriaga's father helped load the van and left with Arriaga. It is therefore plausible that his testimony regarding the items he and Arriaga loaded into the van when they left Torres's property would have supported Arriaga's defense that Torres's funds were not diverted.[7]

Arriaga only needed to make " ' "a minimal showing" ' " of actual prejudice to overcome an insubstantial justification for delay. (*Mirenda, supra*, 174 Cal.App.4th at p. 1332.) He did not have to demonstrate that the lost evidence would have provided a complete defense to meet his burden. (See *People v. Conrad*

---

[7] Even assuming Arriaga took materials from the jobsite that should have been used on the project, Arriaga's father's testimony may have been relevant to whether the value of the materials equaled or exceeded the threshold amount necessary to establish a felony under section 484b.

18

(2006) 145 Cal.App.4th 1175, 1185 [lost evidence, while not conclusive, arguably supported defense and therefore defendant prejudiced by its loss].)  Substantial evidence does not support the trial court's conclusion that Arriaga failed to make a prima facie showing of prejudice with respect to his father's testimony.

## B. There was no substantial evidence to support a finding that there was a legitimate justification for the People's post-complaint delay

Because Arriaga made a prima facie showing of prejudice, the burden shifted to the People to offer a legitimate reason for the delay.[8]

The People must establish a legitimate justification for delay by demonstrating that the delay was caused by "a reasonable 'police purpose' . . . ."  (*Penney v. Superior Court* (1972) 28 Cal.App.3d 941, 953 (*Penney*).)  "Delays in arrest that are necessary for law enforcement purposes, i.e., those occasioned by inability to locate the accused or witnesses, or to conduct further investigation and gather evidence, do not violate the right to speedy trial unless the prosecution is delayed unreasonably." (*Serna v. Superior Court* (1985) 40 Cal.3d 239, 249; *Penney*, at p. 953 [police purposes for delay include defendant awaiting trial on other charges, or defendant absconding or in federal custody].)

"The requirement of a legitimate reason for the prosecutorial delay cannot be met simply by showing an absence

---

[8]     Although the trial court concluded Arriaga failed to demonstrate any actual prejudice, the court nonetheless considered whether a legitimate justification for the People's delay outweighed any prejudice.  We therefore review the trial court's findings, rather than remanding for the court to evaluate prejudice and engage in the necessary balancing test.

of deliberate, purposeful or oppressive police conduct.  A 'legitimate reason' logically requires something more than the absence of governmental bad faith." (*Penney*, *supra*, 28 Cal.App.3d at p. 953.)  Negligence by law enforcement or incompetency by the prosecution are not valid police purposes. (*Ibid*.; see *People v. Williams* (1973) 30 Cal.App.3d 502, 508 [delay between filing of complaint and arrest required dismissal where "oppression or negligence or both clearly appearing, the prosecution had failed to meet the burden of excusing the delay"].)  "[T]o avoid a dismissal, the People must show justification for the entire period of delay."  (*People v. Cave* (1978) 81 Cal.App.3d 957, 966 (*Cave*).)

Substantial evidence did not support the conclusion that the People's delay in prosecuting Arriaga was justified.  It is undisputed that the People made no effort to bring Arriaga to trial before his arraignment.  The record reflects no attempts by the People to locate Arriaga during this period.  Nor is there evidence that the People tried to contact Arriaga.  The People concede that there is no evidence indicating they gave Arriaga notice of the warrant.  (See *Cave*, *supra*, 81 Cal.App.3d at p. 965 [delay unjustified where law enforcement made reasonable efforts to locate defendant but did nothing to return defendant to jurisdiction "or to notify him of the charges against him"].) Moreover, the People represented that in 2024, an investigation by the district attorney's office revealed Arriaga had applied for a driver's license in Nevada in 2011.  There can be no valid police purpose for a delay where, as here, the defendant is "not in hiding and his whereabouts could have been discovered by a routine, uncomplicated investigation."  (See *Jones v. Superior Court* (1970) 3 Cal.3d 734, 741.)

20

*Mirenda* is instructive. In 1981, the San Diego County District Attorney filed a complaint against Mirenda for the attempted murder of his roommate. (*Mirenda, supra,* 174 Cal.App.4th at pp. 1318–1319.) Law enforcement arrested Mirenda in Pennsylvania in 1982, but the district attorney declined to extradite him after authorities failed to locate his roommate. (*Id.* at p. 1318.) Mirenda was informed that the charges had been dismissed and was released. (*Ibid.*) In 2007, Mirenda learned he still had an outstanding arrest warrant in California when he applied for disability benefits. (*Id.* at pp. 1318–1319.) He contacted authorities in San Diego, and the district attorney confirmed his warrant had been changed from "no extradition" to "California only." (*Id.* at p. 1319.) Mirenda was then arrested on a current warrant and the district attorney proceeded with the prosecution in 2007. (*Ibid.*)

The court affirmed dismissal of the case based on a violation of Mirenda's right to a speedy trial under the state constitution. (*Mirenda, supra,* 174 Cal.App.4th at p. 1331.) With respect to justification for delay, the court noted that the prosecution proffered "absolutely no justification" for the 25-year delay since it made the "tactical decision" not to extradite Mirenda in 1982. (*Id.* at pp. 1332, 1333.) The prosecution "did not attempt to show that they tried to locate" Mirenda after releasing him from custody "until Mirenda essentially contacted them." (*Id.* at p. 1332.) The court also concluded that as early as 1982, "the case was . . . ripe for prosecution because the investigation was complete." (*Id.* at p. 1333.)

The People here similarly provide "absolutely no justification" for the delay. (*Mirenda, supra,* 174 Cal.App.4th at p. 1332.) They do not indicate they took any affirmative steps to

21

locate Arriaga in the 16 years between the filing of the felony complaint and Arriaga's 2023 appearance in court. No evidence suggests, and the People do not contend, that the case against Arriaga was not ripe for prosecution in 2007. Indeed, the CSLB investigation had been completed months earlier. Further, as in *Mirenda*, Arriaga's conduct was the key reason his prosecution resumed at all. The People did not locate and arrest Arriaga to reinitiate proceedings; rather, Arriaga returned to California and appeared before the court in 2023 of his own accord. In the absence of any evidence reflecting the People's efforts to notify, locate, or prosecute Arriaga between 2007 and 2023, there is no factual basis to support the conclusion that the delay was justified.

The People appear to contend that they were not required to show a justification for the delay because Arriaga waived his speedy trial right by "ma[king] himself a fugitive from the [CSLB] and the court system." (*People v. Garcia* (2014) 223 Cal.App.4th 1173, 1178–1179.) The People point to Arriaga's failure to maintain a contractor's license in California, his failure to renew his California driver's license, his failure to respond to the CSLB investigator, and his decision to move out of California. These facts do not establish waiver under the circumstances of this case.

Courts have held that defendants who knew they were liable for criminal conduct in California when they fled the country are deemed to have waived their right to a speedy trial by evading prosecution. (*People v. Garcia, supra*, 223 Cal.App.4th at p. 1178; *People v. Perez* (1991) 229 Cal.App.3d 302, 308.) However, "[t]he waiver of the right to a speedy trial, like all waivers, must be knowing: a defendant who leaves the

court's jurisdiction not knowing charges are pending does not thereby waive the right to a speedy trial." (*People v. Garcia*, at p. 1178.)

Here, the People did not notify Arriaga about the arrest warrant or the criminal complaint. Even if the evidence permitted an inference that Arriaga knew or suspected he might be subject to criminal prosecution after receiving the CSLB contact letter, the People have proffered no evidence that he moved to Nevada or elsewhere to evade the charges. The record does not indicate that Arriaga immediately fled California, or even that he vacated his prior address after receiving the CSLB's communications. (See, e.g., *U.S. v. Mendoza* (9th Cir. 2008) 530 F.3d 758, 763 [in federal speedy trial right context, "if the defendant is not attempting to avoid detection and the government makes no serious effort to find him, the government is considered negligent in its pursuit"; even though defendant left the country prior to his indictment, "the government still had an obligation to attempt to find him and bring him to trial"].)

Further, to the extent the People rely on Arriaga's non-responsiveness to the CSLB investigation as justification for the delay, or as proof of waiver, the argument is unavailing. The CSLB conducted an investigation as part of its administrative complaint process. The CSLB contact letter sent to Arriaga informed him about the pending investigation and that he had the opportunity to participate, but it did not indicate that he could be subject to criminal prosecution as a result of the investigation. Nor does the record indicate that Arriaga was notified when the CSLB referred the case to the district attorney. The People provide no authority, and we have found none, for their contention that the CSLB's attempts to contact Arriaga

23

were alone sufficient to eliminate any need for the People to make any further attempts.

In sum, the People provide no factual or legal support for the conclusion that Arriaga's inaction in the face of a licensing agency's investigation of a complaint, which preceded involvement by the district attorney and omitted any reference to potential criminal liability, constituted a waiver of Arriaga's right to a speedy trial, or otherwise justified the People's 16-year delay in pursuing a subsequent criminal prosecution.

Finally, the People argue that Arriaga waived his right to a speedy trial by choosing "to engage in a profession that required a license without having one. . . .  By choosing not to become licensed, [Arriaga] removed himself from a system of regulatory oversight.  If he were licensed, he would have been required to regularly update his contact information."  We must reject this argument as inconsistent with the right to a speedy trial. Arriaga is alleged to have acted illegally by contracting without a license.  Yet, the right to a speedy trial under the California Constitution applies to individuals accused of committing all crimes.  We are aware of no exception that applies simply because one of the aspects of the alleged criminal conduct is that the defendant has failed to participate in a system that would make that defendant easier to locate.  Failing to participate in this regulatory system, while illegal, is not necessarily tantamount to, or evidence of, the evasion of prosecution for speedy trial purposes.

Similarly, the People's contention that Arriaga "[made] himself scarce" by not appearing to have a valid driver's license in California or Nevada between 2009 and 2011, puts the cart before the horse since the People do not assert they made even a

cursory attempt to contact or locate Arriaga, at any time, and they have no evidence that he was informed of the criminal charges against him. (See, e.g., *U.S. v. Velasquez* (3d Cir. 2014) 749 F.3d 161, 179–180 [in context of federal speedy trial right, rejecting argument that defendant's " 'transient' lifestyle" made it difficult for authorities to locate him and justified government's "meager search"; although government can only pursue "reasonably available leads," court's focus must be on whether government "has diligently used the information available to it"].)

In the absence of any evidence that the People took steps to contact or locate Arriaga after filing the criminal complaint, and in light of evidence that information about Arriaga's whereabouts was readily available as early as 2011, we conclude substantial evidence does not support the finding that the People established a reasonable justification for the 16-year delay between the filing of the felony complaint and Arriaga's arraignment.[9]

---

[9] The People alternatively request that we remand for a hearing to allow the People to present "evidence, if any, of efforts made to locate and serve" Arriaga after the felony complaint was filed in 2007. We decline to do so. The People had the opportunity to present all evidence regarding their efforts to contact Arriaga in the trial court. There, as here, they had the burden to show that the delay was justified by a legitimate purpose. That they elected not to submit all relevant evidence in support of their burden in the first instance does not entitle them to "a second bite at the apple" on remand. (*People v. Franco* (2024) 99 Cal.App.5th 184, 196, fn. 5 [no second hearing where the People had opportunity to present evidence at first hearing, because "the merits briefing is the main event, not a dress rehearsal"].)

**C.    It was an abuse of discretion to conclude the justification for the delay outweighed the prejudice to Arriaga**

Courts must balance the defendant's showing of prejudice against the People's explanation for delay.  "The balancing task is a delicate one, 'a minimal showing of prejudice may require dismissal if the proffered justification for delay is insubstantial. [Likewise], the more reasonable the delay, the more prejudice the defense would have to show to require dismissal.'  [Citation.]" (*People v. Boysen* (2007) 165 Cal.App.4th 761, 777.)

Here, substantial evidence did not support the conclusion that Arriaga failed to make a prima facie showing that the 16-year delay in this case prejudiced his defense.  Further, there was no evidence to support a conclusion that the People's delay was reasonable, or that Arriaga waived his speedy trial right.  As such, the trial court abused its discretion by concluding the People's justification for the delay outweighed the prejudice to Arriaga.

## DISPOSITION

The petition for writ of prohibition is granted.  Respondent Los Angeles Superior Court is directed to vacate its order denying petitioner's motion to dismiss, and to enter a new order granting the motion with respect to count 1 of the amended information charging Arriaga with a violation of section 484b.  Our stay of proceedings in this matter is vacated.

**CERTIFIED FOR PUBLICATION**


ADAMS, J.

We concur:


EDMON, P. J.


EGERTON, J.